**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **MONUMENT PEAK VENTURES, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Case No. 2:23-cv-00169** |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **BLU PRODUCTS, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Monument Peak Ventures, LLC ("MPV" or "Plaintiff") files this Original Complaint against BLU Products, Inc., ("BLU" or "Defendant") for infringement of U.S. Patent No. 6,862,039 ("the '039 Patent"), U.S. Patent No. 7,092,573 ("the '573 Patent"), U.S. Patent No. 7,212,668 ("the '668 Patent"), and U.S. Patent No. 7,683,962 ("the '962 Patent") (collectively, "the Asserted Patents").

**THE PARTIES**

1.    Monument Peak Ventures, LLC ("MPV") is a Texas limited liability company with its principal place of business in Allen, Texas.

2.    On information and belief, BLU is a Delaware corporation with its headquarters and principal place of business at 10814 NW 33rd Street, Bldg. 100, Miami, Florida 3312.

3.    On information and belief, BLU may be served with process through its registered agent, Bernard Egozi, Egozi & Bennett, P.A., 2999 NE 191st Street, Suite 407, Aventura, FL 33180.

4.    On information and belief, BLU manufactures, imports into the United States, sells for importation, markets, offers for sale, sells, and distributes within the United States after importation products, including BLU's smartphones, that directly infringe, literally and/or under

the doctrine of equivalents, one or more claims of the Asserted Patents in violation of 35 U.S.C. § 271(a).

5.      BLU produces smartphones (e.g. BLU G91) that perform methods for processing digital images that enhance digital features in those images according to particularly programmed algorithms, e.g. a "beauty" mode, included with the smartphones. BLU additionally produces smartphones (e.g., BLU Vivo X) that perform methods for processing digital images with different angles of view and use imaging stages for outputting an image and a distance map of a scene from a captured image signal. The BLU G91 and BLU Vivo X and BLU smartphones with similar functionality are collectively referred to as the "Accused Products."

6.      Defendant has agents, for example authorized sellers and sales representatives ,that offer and sell products pertinent to this Complaint through the State of Texas, including in this Judicial District, and to consumers throughout this Judicial District, such as: Staples; Office Depot; Amazon.com;   Best Buy, 422 West TX-281 Loop, Suite 100, Longview, Texas 75605; and Walmart, 1701 E. End Blvd. N., Marshall, Texas 75670; 515 E. Loop 281, Longview, Texas 756705; and 4006 Estes Pkwy, Longview, Texas 75603.

7.      Prior to the filing of its Complaint, MPV repeatedly attempted to engage Defendant and/or its agents in licensing discussions related to the Asserted Patents. Defendant's past and continuing sales of its devices i) willfully infringe the Asserted Patents and ii) impermissibly take the significant benefits of MPV's patented technologies without fair compensation to MPV.

## JURISDICTION AND VENUE

8.      This action arises under the patent laws of the United States Patent Act, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.

9.      This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the patent laws of the United States, 35 U.S.C. §§ 271

et seq.

10.    This Court has general and specific personal jurisdiction over BLU pursuant to due process and/or the Texas Long Arm Statute because, inter alia, (i) Defendant has done and continues to do business in Texas and (ii) Defendant has, directly and through intermediaries, committed and continues to commit acts of patent infringement in the State of Texas, including making, using, offering to sell, and/or selling accused products in Texas, and/or importing accused products into Texas, including by Internet sales and sales via retail and wholesale stores, inducing others to commit regular acts of patent infringement in Texas, and/or committing a least a portion of any other infringements alleged herein.

11.    Defendant has placed, and is continuing to place, infringing products into the stream of commerce, via an established distribution channel, with the knowledge and/or understanding that such products are sold in Texas, including in this District. Defendant has derived substantial revenues from its infringing acts occurring within Texas and within this District. Defendant has substantial business in this State and judicial district, including: (A) at least part of its infringing activities alleged herein; and (B) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods offered for sale, sold, and imported, and services provided to Texas residents vicariously through and/or in concert with its alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users, and/or consumers.

12.    Personal jurisdiction is proper because Defendant has committed acts of infringement in this District. This Court has personal jurisdiction over Defendant because, *inter*

*alia*, this action arises from activities Defendant purposefully directed towards the State of Texas and this District.

13.     Exercising personal jurisdiction over Defendant in this District would not be unreasonable given Defendant's contacts in this District, the interest in this District of resolving disputes related to products sold herein, and the harm that would otherwise occur to MPV.

14.     In addition, Defendant has knowingly induced and continues to knowingly induce infringement within this District by advertising, marketing, offering for sale and/or selling devices including infringing functionality within this District, to consumers, customers, manufacturers, distributors, resellers, partners, and/or end users, and providing instructions, user manuals, advertising, and/or marketing materials which facilitate, direct or encourage the use of infringing functionality with knowledge thereof.

15.     This Court has personal jurisdiction over Defendant because it has continuous and systematic business contacts with the State of Texas.  Defendant, directly and through subsidiaries or intermediaries (including distributors, retailers, and licensing partners, dealer agents, and Mobile Virtual Network Operators), conduct business extensively throughout Texas, by shipping distributing, making, using, offering for sale, selling, licensing, transmitting (including through its mobile applications and networks) its infringing products in the state of Texas and the Eastern District of Texas. Furthermore, Defendant has purposefully placed its products into the stream of commerce with the intention and expectation that they will be purchased and used by consumers in this state and this District.  Defendant has sold and offered to sell, and continues to sell and offer to sell, its infringing products within this district and has committed regular acts of direct and indirect infringement in this district.  Defendant's contacts with the State of Texas and this District

are so pervasive that this Court's exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

16.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). BLU does business in this judicial district, selling in and delivering mobile phone products into this judicial district, advertising products for sale to potential customers in this district, and instructing end users how to use BLU's infringing products in this judicial district. BLU has committed acts of infringement in this judicial district and has purposely transacted business in this judicial district involving the Accused Products. On information and belief, Defendant has admitted or not contested proper venue in this Judicial District in past infringement actions.

## **BACKGROUND**

17.    On or about February 19, 2020, MPV, a technology licensing company, approached BLU to offer a license to MPV's Kodak portfolio. Since MPV acquired the Kodak portfolio it has successfully licensed several companies without resorting to litigation. Consistent with MPV's overall strategy to use litigation only as a last resort, MPV expressed on numerous occasions its desire to consummate a license with BLU outside of litigation.

18.    MPV informed BLU of its infringement through a data room that included a full list of all patents owned by MPV and evidence of use presentations providing information sufficient to show BLU's infringement. MPV and BLU had ongoing discussions under NDA between February 19, 2020 and mid-March 2022 when BLU went silent. MPV alleges that BLU directly and indirectly infringes the Asserted Patents by making, using, offering for sale, selling, and/or importing smartphones including one or more cameras, such as the Accused Devices. MPV seeks damages and other relief for BLU's infringement of the Asserted Patents.

## THE ASSERTED PATENTS

### The Asserted Patents Come From the Iconic Kodak Patent Portfolio

19.    The Asserted Patents claim inventions born from the ingenuity of the Eastman Kodak Company ("Kodak"), an iconic American imaging technology company that dates back to the late 1800s. The first model of a Kodak camera was released in 1888.

20.    In 1935 Kodak introduced "Kodachrome," a color reversal stock for movie and slide film. In 1963 Kodak introduced the Instamatic camera; an easy-to-load point-and-shoot camera. By 1976 Kodak was responsible for 90% of the photographic film and 85% of the cameras sold in the United States. At the peak of its domination of the camera industry, Kodak invented the first self-contained digital camera in 1975.

21.    By 1986 Kodak had created the first megapixel sensor that was capable of recording 1,400,000 pixels. While innovating in the digital imaging space, Kodak developed an immense patent portfolio and extensively licensed its technology. For example, in 2010, Kodak received $838,000,000 in patent licensing royalties. As part of a reorganization of its business, Kodak sold many of its patents to some of the biggest names in technology that included Google, Facebook, Amazon, Microsoft, Samsung, Adobe Systems, HTC and others for $525,000,000. While numerous digital imaging companies license the use of the Kodak patent portfolio owned by MPV, BLU persists on infringing the Asserted Patents and using MPV's technology without a license and with knowledge of their ongoing infringement.

### U.S. Patent No. 6,862,039

22.    The '039 Patent is titled "Electronic Camera Including Color Tone Adjustment of a Real-Time Image" and is attached as Exhibit A. The inventions claimed in the '039 Patent generally relate to a novel method for adjusting the color tone of a real-time image according to an entered adjustment value and correcting the real-time image according to an adjusted color tone.

23.    The '039 Patent lawfully issued on March 01, 2005, from United States Patent Application Serial No. 09/810,788 filed on March 16, 2001.

24.    The claims of the '039 Patent are directed to a technical solution for a technical problem and patent possess specific limitations for a specific improvement. For example, the specification of the '039 Patent discloses shortcomings in the prior art and then explains the technical way the inventions claimed in the '039 Patent resolve or overcome those shortcomings. *See, e.g.*, '039 Patent, 1:14-34, 3:25-4:31.

25.    Each claim of the '039 Patent is presumed valid and is directed to patent eligible subject matter under 35 U.S.C. § 101. *See McRO, Inc. v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1316 (Fed. Cir. 2016) (providing abbreviated analysis under § 101 for "clear improvements" in computer-related technology). The technologies claimed in the '039 Patent disclose a specific manner of image enhancement including the color tone adjustment of a real-time image. *See e.g.*, '039 Patent, 1:26-60 ("With the electronic camera of the present invention, the operator can view the image shown in real time and adjust the color tone. Operability is therefore further improved.").

**U.S. Patent No. 7,092,573**

26.    The '573 Patent is titled "Method and System for Selectively Applying Enhancement to an Image." The inventions claimed in the '573 Patent generally relate to digital image processing and, more particularly, to a method for determining the amount of enhancement applied to an image based on subject matter in the image." The '573 Patent is attached as Exhibit B.

27.    The '573 Patent lawfully issued on August 15, 2006, and stems from United States Application No. 10/016,601 filed December 10, 2001.

28.    The claims of the '573 Patent are directed to a technical solution for a technical problem and patent possess specific limitations for a specific improvement. For example, the

specification of the '573 Patent discloses shortcomings in the prior art and then explains the technical way the inventions claimed in the '573 Patent resolve or overcome those shortcomings. *See, e.g.*, '573 Patent, 1:13-2:38.

29.     For instance, the '573 Patent specification states that, at the time of the invention, conventional methods for enhancing images (e.g., sharpening an image) "may result in undesirable removal of details in grass lawn, textured fabric, or animal hair" and that in conventional systems "the amount of sharpening, or any other type of enhancement, needs to be adjusted individually for each scene by a human operator, an expensive process" and that a further "drawback of the conventional approach is that the amount of sharpening cannot be adjusted easily on a region by region basis within the same image, resulting in having to apply an amount of enhancement that is a trade-off between different amounts required by different subject matters or objects in the scene." '573 Patent, 1:21-42. This led to a need for an improved system for determining the types and amounts of enhancement for a particular image, whereby the local quality (e.g., sharpness and color) of the image can be improved." '573 Patent, 2:33-37.

30.     Each claim of the '573 Patent is presumed valid and is directed to patent eligible subject matter under 35 U.S.C. § 101 and the technologies claimed in the '573 Patent disclose improvements based on controlling image enhancement which are clear improvements in the computer-related technology of digital image enhancement. *See McRO, Inc. v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1316 (Fed. Cir. 2016).

31.     For example, Claim 1 of the '573 Patent is directed to a specific method for processing a digital image.  The method requires (1) "applying a subject matter detector to the digital image to produce a belief map of values indicating the degree of belief that pixels in the digital image belong to target subject matter, said values defining a plurality of belief regions;" (2)

"determining the sizes of each of said belief regions in said belief map;" and (3) "enhancing the digital image, said enhancing varying pixel by pixel in accordance with both the degree of belief and the size of the respective said belief region." Based on these limitations, the claims provide limiting detail that confines the claim to a concrete solution to an identified problem. These claim elements as an ordered combination were not well-understood, routine, and conventional at the time of the invention.

32.      The specification of the '573 Patent also makes clear that the technologies claimed in the '573 Patent consist of features and functions that were not, alone or in combination, considered well-understood by, and routine, generic, and conventional to skilled artisans in the industry at the time of invention stating that conventional methods for enhancing images was unpredictable, where "the quality of the resulting image often varies depending on the image content" such as "removal of details" like "texture. . ." '573 Patent, 1:21-42. This led to a need that was satisfied by the claimed method, for example, "determining the types and amounts of enhancement for a particular image, whereby the local quality (e.g., sharpness and color) of the image can be improved depending on detecting different objects or subject matters contained within the image." *Id.* at 2:33-37.

**U.S. Patent No. 7,212,668**

33.      The '668 Patent is titled "Digital Image Processing System and Method for Emphasizing a Main Subject of an Image" and is attached as Exhibit C. The inventions claimed in the '668 Patent generally relate to processing of images made up of pixels, and more particularly to processing image pixels to emphasize the main subject of the image.

34.      The '668 Patent lawfully issued on May 1, 2007, and stems from United States Application No. 09/642,533 filed August 18, 2000. The '668 Patent expired on July 13, 2022;

however, Plaintiff seeks damages for past infringement for "six years prior to the filing of the complaint" as provided for under 35 U.S.C. § 286.

35.     The claims of the '668 Patent are directed to a technical solution for a technical problem and the patent possess specific limitations for a specific improvement. For example, the specification of the '668 Patent discloses shortcomings in the prior art and then explains the technical way the inventions claimed in the '668 Patent resolve or overcome those shortcomings. *See, e.g.*, '668 Patent, 1:13-3:22.

36.     For instance, the '668 Patent specification states that, at the time of the invention it was known to "manually identify the main subject of an individual image or frame of a motion picture, and then to manipulate the color values to obtain a desired emphasizing effect." '668 Patent, 1:15-29. This manual process was used in effects such as "blurring the background or changing the background to black and white have been used" but such processes were "very labor intensive and hence costly to implement. Yet, the effect is so desirable that motion picture producers are willing to invest the expense to produce images having these effects." '668 Patent, 1:15-29. Also, the "labor intensive manual effort that is needed [in creating similar effects] greatly limits the use of such techniques." '668 Patent, 1:30-42. This led to a need for an improved system for "an automated method of processing an image having pixels to emphasize a main subject in the image." '668 Patent, 1:43-45.

37.     Each claim of the '668 Patent is presumed valid and is directed to patent eligible subject matter under 35 U.S.C. § 101 and the technologies claimed in the '668 Patent disclose clear improvements in the computer-related technology of digital image enhancement. *See McRO, Inc. v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1316 (Fed. Cir. 2016).

38.     For example, Claim 1 of the '668 Patent is directed to a specific method for

modifying a digital image, emphasizing a main subject by (1) "automatically identifying the main subject of the image, and" (2) "automatically altering pixel values of said image to emphasize said main subject, said altering following said identifying;" and (3) "said altering follows any and all identifying of said main subject and wherein said identifying further comprises: segmenting said image into a plurality of regions; and generating a plurality of belief values, each said belief value being associated with one of a plurality of regions of the image, said belief values each being related to the probability that the associated region is a main subject of the image, to provide a main subject belief map." Based on these limitations, the claims provide limiting detail that confines the claim to a concrete solution to an identified problem. These claim elements as an ordered combination were not well-understood, routine, and conventional at the time of the invention.

39.    The specification of the '668 Patent also makes clear that the technologies claimed in the '668 Patent consist of features and functions that were not, alone or in combination, considered well-understood by, and routine, generic, and conventional to skilled artisans in the industry at the time of invention stating that "[c]onventional wisdom in the field of computer vision, which reflects how a human observer would perform such tasks as main subject detection and cropping, calls for a problem-solving path via object recognition and scene content determination according to the semantic meaning of recognized objects" and "rely on a manually created mask to outline where the main subject is." However, this manual procedure was "laborious" and not feasible for use in industries such as commercial photo finishing. '668 Patent, 5:30-61. This led to a need that was satisfied by the claimed method by providing an improved system using a technical solution involving, for example "automatically identifying a main subject of the image and altering pixel values to emphasize the main subject . . . accomplished by, among

other techniques, altering pixel values in the main subject or altering pixel values in the background, or both." '668 Patent, 1:49-56.

**U.S. Patent No. 7,683,962**

40.     The '962 Patent is titled "Camera Using Multiple Lenses and Image Sensors in a Rangefinder Configuration to Provide a Range Map" and is attached as Exhibit D.  The inventions claimed in the '962 Patent generally relate to digital cameras providing a novel and inventive method that uses multiple lenses and image sensors to provide an improved and extended range-finding capability by utilizing both images to support a range mapping function.

41.     The '962 Patent lawfully issued on May 12, 2009 and stems from United States Application No. 11/684,036 filed March 23, 2010.

42.     The claims of the '962 Patent are directed to a technical solution for a technical problem and patent possess specific limitations for a specific improvement. For example, the specification of the '962 Patent discloses shortcomings in the prior art and then explains the technical way the inventions claimed in the '962 Patent resolve or overcome those shortcomings. *See, e.g.*, '962 Patent, 1:15-7:25.

43.     Each claim of the '962 Patent is presumed valid and is directed to patent eligible subject matter under 35 U.S.C. § 101 and the technologies claimed in the '962 Patent disclose a specific manner of using a range map to modify an image providing "an improved capability in a multi-lens digital camera for measuring the distance to portions of the scene being photographed." '962 Patent, 7:29-35.   Thus the technologies claimed in the '962 Patent disclose clear improvements in the computer-related technology of digital image enhancement. *See McRO, Inc. v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1316 (Fed. Cir. 2016).

44.     For example, Claim 9 of the '962 Patent is directed to a specific method and system

to enable dynamic depth of field images by blurring of portions of the output image that correspond to areas of the scene that lie outside of a desired depth of field. *See, e.g.,* '962 Patent, 21:15-55.

### COUNT I
### (Infringement of U.S. Patent No. 6,862,039)

45.    Plaintiff incorporates paragraphs 1 through 45 herein by reference.

46.    This cause of action arises under the patent laws of the United States, including 35 U.S.C. §§ 271, *et seq.*

47.    Plaintiff is the owner of the '039 Patent with all substantial rights to the '039 Patent including the exclusive right to enforce, sue, and recover damages for past and future infringement.

48.    The '039 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

### DIRECT INFRINGEMENT (35 U.S.C. § 271(a))

49.    Defendant has, and continues to, infringe one or more claims of the '039 Patent in this District and elsewhere in Texas and the United States.

50.    On information and belief, Defendant has, and continues to, via an agent or agents, infringe claims of the '039 Patent (including for example, and as illustrated below, Claim 1) by, among other things, making, using, testing (including its own use and testing), selling, offering for sale, importing and/or licensing in the United States without authority, systems, products, and methods claimed by the '039 Patent, namely, the BLU G91 smartphone.

51.    Defendant had knowledge of the '039 Patent and its direct infringement since at least February 19, 2020, when Defendant was notified of the Asserted Patents and its infringement of the '039 Patent by an email and link to claim charts detailing Defendant's infringement of the '039 Patent. On information and belief, Defendant was made aware of Plaintiff's Kodak patent portfolio including the '039 Patent since at least February 19, 2020, and thus has had knowledge

of its direct infringement of the '039 Patent since that time.

52.    Upon information and belief, and as one illustration without limitation, Defendant infringes Claim 1 of the '039 Patent in the exemplary manners described below.

53.    The BLU G91 smartphone is an electronic camera which is portable and has a display device for showing a photoelectric-converted image. The G91 (i.e., "electronic camera") is a portable display device capable of displaying a digital image (i.e., "photoelectric-converted image"). *See* https://www.youtube.com/watch?v=0Vmzy78Eb5I



54.    The BLU G91 comprises an "input means for entering a color tone adjustment value of a real-time image shown on the display device" and an "adjustment means for adjusting the color tone of the real-time image according to the entered adjustment value."

55.    The BLU G91 smartphone's ISO buttons (i.e., "input means") allow the user to input a white balance value (i.e., "color tone adjustment value") (e.g., value associated with sun icon) of a real-time image shown on the display. BLU smartphones include hardware/circuitry (i.e., "adjustment means') which adjusts the white balance value of the real-time image according

to the entered adjustment value (e.g., value associated with lightbulb icon --> value associated with sun icon).



56.    The BLU 91 also comprises a "correction means for correcting the real-time image according to the adjusted color tone" in that it contains hardware/circuitry (i.e., "correction means") to correct the real-time image according to the adjusted white balance (e.g., value associated with lightbulb icon --> value associated with sun icon adjusted color tone).

57.    To the extent that Defendant has assigned performance of these steps to third parties, such as its customers, agents, or contractors for testing, demonstrations, repair and the like, the third parties acted vicariously as an agent, under the direction and control of the Defendant, or formed a joint enterprise with Defendant, to infringe at least Claim 1 of the '039 Patent. Alternatively, the Defendant contracted with the third parties to perform the infringing steps. Defendant profited vicariously from third party infringement, conditioned the third parties' participation and receipt of benefits of the BLU G91 camera on the performance on the infringing

activity and further established the respective timing and manner of the third parties' performance of the infringing activity.

58.    Defendant's infringing activities were without authority or license under the '039 Patent.  Thus, Defendant has infringed at least Claim 1 of the '039 Patent under at least 35 U.S.C. § 271(a) by its prior use, testing, manufacture, sale, offer for sale, licensing, and/or importation of the Accused Products without authority.

**INDIRECT INFRINGEMENT (INDUCEMENT - 35 U.S.C. § 271(b))**

59.    Based on the information presently available to Plaintiff, absent discovery, in the alternative and in addition to direct infringement, Defendant has, and continues to, indirectly infringe one or more claims of the '039 Patent by inducing direct infringement of the Accused Products by others, including, but not limited to subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users.

60.    Defendant had knowledge of the '039 Patent and its indirect infringement since at least February 19, 2020, when Defendant was notified of the Asserted Patents and its infringement of the '039 Patent when Defendant received an email and link to claim charts detailing Defendant's infringement of the '039 Patent. On information and belief, Defendant was made aware of Plaintiff's Kodak patent portfolio including the '039 Patent since at least February 19, 2020, and thus has had knowledge of its indirect infringement of the '039 Patent since then.

61.    On information and belief, despite having knowledge of the '039 Patent and its infringement, Defendant specifically intended and encouraged one or more of its subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and end users to make, use, offer for sale, or sell in the United States and/or import the BLU G91 smartphone into the United States, which (as illustrated above) infringes claims of the '039 Patent. Defendant's acts

resulted in direct infringement by such subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users for making, using offering for sale, selling, and/or importing the BLU G91 smartphone.

62.     Defendant has also specifically intended and encouraged individuals in this district and elsewhere in the United States to directly infringe claims of the '039 Patent (e.g., Claim 1 as described above) by acquiring and using the BLU G91 smartphone. Despite having knowledge of the '039 Patent and its infringement, Defendant has instructed and encouraged end users of the BLU G91 smartphone in a manner that infringes the '039 Patent. Defendant's acts resulted in direct infringement for use of the BLU G91 smartphone by end users of such products.

63.     Plaintiff has been damaged as a result of Defendant's unlicensed infringing conduct described in this Count. Defendant is thus liable to Plaintiff in an amount that adequately compensates Plaintiff for Defendant's infringement, which, by law, cannot be less than a reasonable royalty together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

64.     Plaintiff has satisfied the requirements of 35 U.S.C. § 287 and is entitled to recover damages for infringement occurring before the filing of this lawsuit.

## COUNT II
### (Infringement of U.S. Patent No. 7,092,573)

65.     Plaintiff incorporates paragraphs 1 through 65 herein by reference.

66.     This cause of action arises under the Patent laws of the United States, including 35 U.S.C. §§ 271, *et seq*.

67.     Plaintiff is the owner of the '573 Patent with all substantial rights to the '573 Patent including the exclusive right to enforce, sue, and recover damages for past and future infringement.

68.     The '573 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

## DIRECT INFRINGEMENT (35 U.S.C. § 271(a))

69.     Defendant has, and continues to, infringe one or more claims of the '573 Patent in this District and elsewhere in Texas and the United States.

70.     On information and belief, Defendant has, and continues to, via an agent or agents, infringe claims of the '573 Patent (including for example, and as illustrated below, Claim 1) by, among other things, making, using, testing (including its own use and testing), selling, offering for sale, importing and/or licensing in the United States without authority, the systems, products, and methods claimed by the '573 Patent, namely, the BLU G91 smartphone.

71.     On information and belief, Defendant was made aware of Plaintiff's Kodak patent portfolio including the '573 Patent since at least February 19, 2020, and thus has had knowledge of its direct infringement of the '573 Patent since that time.

72.     Upon information and belief, and as one illustration without limitation, Defendant infringes Claim 1 of the '573 Patent in the exemplary manners described below.

73.    BLU G91 smartphones perform a method for processing a digital image using the phone's dual angle lenses.



https://www.bluproducts.com/devices/g91/salesguide/g91-sg.pdf

74.     BLU G91 cameras apply a beauty mode subject matter belief detector to the digital image to identify the pixels containing target subject matter such as eyes or skin. The process of identifying target subject matter includes identifying pixels that are likely to belong to the subject matter, resulting in a map of belief values. Thus, BLU G91 smartphones apply a subject matter detector to the digital image to produce a belief map of saliency values indicating the degree of the belief that they belong to a main subject (i.e., "target subject matter"), said values defining a plurality of belief regions. *See* https://www.bhphotovideo.com/c/product/1622945-REG/blu_g0410ww_gn_g91_g0410ww_gsm_phone.html/overview

### Portrait & Beauty Mode

One of the most popular photos to take are of people's faces, whether they be our family, friends, or even ourselves. That's why both rear and front cameras have been equipped with selectable background blur capabilities, which delivers a professional look that highlights and enhances the subject.

The additional beauty mode gives you a handful of sliders to fine-tune and adjust the photo you've taken, to make the person in them look their very best. You get an Auto Beauty slider for quick, automatic adjustments, as well as Slimming, Smoother, Eye Enlarger, and Whitening sliders.

75.     BLU cameras determine the sizes of each belief region and enhance the image pixel by pixel in accordance with the identification of target subject matter (i.e., threshold degree of belief) and the size of the respective belief region. For example, if "Whitening" is selected, the pixels comprising skin are enhanced pixel by pixel in accordance with the belief that the pixels comprise skin and the size of the region identified as skin.



https://www.bluproducts.com/devices/g91/salesguide/g91-sg.pdf

76.     Thus the G91 smartphone determines the sizes of each of the belief regions in the belief map enhancing the digital image (enhancing varying pixel by pixel in accordance with both the degree of belief and the size of the respective belief region).

77.     Defendant is liable for its infringements of the '573 Patent pursuant to 35 U.S.C. § 271.

**INDIRECT INFRINGEMENT (INDUCEMENT - 35 U.S.C. §271(b))**

78.     Based on the information presently available to Plaintiff, absent discovery, in the alternative and in addition to direct infringement, Defendant has, and continues to, indirectly

infringe one or more claims of the '573 Patent by inducing direct infringement of the Accused Products by others, including, but not limited to subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users.

79.     On information and belief, Defendant was made aware of Plaintiff's Kodak patent portfolio including the '573 Patent since at least February 19, 2020, and thus has had knowledge of its indirect infringement of the '573 Patent since that time.

80.     On information and belief, despite having knowledge of the '573 Patent and its infringement, Defendant specifically intended and encouraged one or more of its subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users to make, offer for sale, or sell in the United States and/or import the BLU G91 smartphone into the United States, which (as illustrated above) infringes claims of the '573 Patent. Defendant's acts have resulted in, and continue to result in, direct infringement by such subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users for making, using offering for sale, selling, and/or importing the BLU G91 smartphone.

81.     Defendant has also specifically intended and encouraged individuals in this District and elsewhere in the United States to directly infringe claims of the '573 Patent (e.g., Claim 1 as described above) by acquiring and using the BLU G91 smartphone. Despite having knowledge of the '573 Patent and its infringement, Defendant has instructed and encouraged end users of the BLU G91 smartphone in a manner that infringes the '573 Patent.

82.     Plaintiff has been damaged as a result of Defendant's unlicensed infringing conduct described in this Count. Defendant is thus liable to Plaintiff in an amount that adequately compensates Plaintiff for Defendant's infringement, which, by law, cannot be less than a reasonable royalty together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

83.    Plaintiff has satisfied the requirements of 35 U.S.C. § 287 and is entitled to recover damages for infringement occurring before the filing of this lawsuit.

## COUNT III
### (Infringement of U.S. Patent No. 7,212,668)

84.    Plaintiff incorporates paragraphs 1 through 84 herein by reference.

85.    This cause of action arises under the patent laws of the United States, including 35 U.S.C. §§ 271, *et seq*.

86.    Plaintiff is the owner of the '668 Patent with all substantial rights to the '668 Patent including the exclusive right to enforce, sue, and recover damages for infringement.

87.    The '668 Patent is valid, was duly issued in full compliance with Title 35 of the United States Code and was enforceable until its expiration on July 13, 2022.

### DIRECT INFRINGEMENT (35 U.S.C. § 271(a))

88.    Defendant has infringed one or more claims of the '668 Patent in this District and elsewhere in Texas and the United States.

89.    On information and belief, Defendant has, either individually or via an agent or agents, infringed claims of the '668 Patent (including for example, and as illustrated below, Claim 1) by, among other things, making, using, testing (including its own use and testing), selling, offering for sale, importing and/or licensing in the United States without authority systems, products, and methods claimed by the '668 Patent, namely, the BLU G91 smartphone.

90.    On information and belief, Defendant was made aware of Plaintiff's Kodak patent portfolio including the '668 Patent since at least February 19, 2020, and thus has had knowledge of its direct infringement of the '668 Patent since then.

91.    Upon information and belief, and as one illustration without limitation, Defendant infringed Claim 1 of the '668 Patent in the exemplary manners described below.

92.     BLU sells phones (e.g. BLU G91) that have a beauty mode function which perform

a method for modifying an image having a main subject and background pixels.



93.    The following G91 screenshots show when a user selects "More" then "Beauty" in the BLU G91 camera app, the G91's "Auto Beauty" automatically identifies a user's facial features (i.e., main subject) in an image (white square) and automatically alters pixel values to enhance the user's beauty (i.e., emphasize the main subject).



94.    Before altering the pixel values, the image is segmented into regions belonging to the user's face and the background (i.e., "plurality of regions") and generates a plurality of belief values associated with the various features on the user's face. Those belief values are each related to the probability that the associated region is a specific facial feature (e.g., eyes, chin, neck, etc.) to provide a main subject belief map to assist in emphasizing the user's face.



95.     Thus the altering follows the identifying of said main subject "wherein said identifying further comprises: segmenting said image into a plurality of regions; and generating a plurality of belief values, each said belief value being associated with one of a plurality of regions of the image, said belief values each being related to the probability that the associated region is a main subject of the image, to provide a main subject belief map."

96.     To the extent that Defendant has assigned performance of these steps to third parties, such as its customers, agents or contractors, the third parties act vicariously as agents of the Defendant, or form a joint enterprise with Defendant, to infringe at least Claim 1 of the '668 Patent.  Alternatively, the Defendant contracts with the third parties to perform the infringing steps. Defendant profits vicariously from third party infringement, condition the third parties' participation and receipt of benefits of the BLU G91 smartphone on the performance on the infringing activity and further establish the respective timing and manner of the third parties' performance of the infringing activity.

97.     Defendant's infringing activities were and are without authority or license under the '668 Patent.  Thus, Defendant has infringed at least Claim 1 of the '668 Patent under at least

35 U.S.C. § 271(a) by its prior use, testing, manufacture, sale, offer for sale, licensing, and/or importation of the Accused Products without authority.

## INDIRECT INFRINGEMENT (INDUCEMENT - 35 U.S.C. § 271(b))

98.    Based on the information presently available to Plaintiff, absent discovery, in the alternative and in addition to direct infringement, Defendant has indirectly infringed one or more claims of the '668 Patent by inducing direct infringement by others, including, but not limited to, its subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users of the BLU G91 smartphone.

99.    On information and belief, Defendant was made aware of Plaintiff's Kodak patent portfolio including the '668 Patent since at least February 19, 2020, and thus has had knowledge of its indirect infringement of the '668 Patent since that time.

100.    On information and belief, despite having knowledge of the '668 Patent and its infringement, Defendants specifically intended and encouraged one or more of its subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users to make, offer for sale, or sell in the United States and/or import the BLU G91 smartphone into the United States, which (as illustrated above) infringes claims of the '668 Patent. Defendant's acts have resulted in direct infringement by such subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users for making, using, offering for sale, selling, and/or importing the BLU G91 smartphone.

101.    Defendant has also specifically intended and encouraged individuals in this district and elsewhere in the United States to directly infringe claims of the '668 Patent (e.g., Claim 1 as described above) by acquiring and using the BLU G91 smartphone. Despite having knowledge of the '668 Patent and its infringement, Defendant has instructed and encouraged end users of the

BLU G91 smartphone in a manner that infringes the '668 Patent. Defendant's acts have resulted in direct infringement for use of the BLU G91 smartphone by end users of such products.

102.    Plaintiff has been damaged as a result of Defendant's unlicensed infringing conduct described in this Count. Defendant is thus liable to Plaintiff in an amount that adequately compensates Plaintiff for Defendant's infringement, which, by law, cannot be less than a reasonable royalty together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

103.    Plaintiff has satisfied the requirements of 35 U.S.C. § 287 and is entitled to recover damages for infringement occurring before the filing of this lawsuit.

## COUNT IV
### (Infringement of U.S. Patent No. 7,683,962)

104.    Plaintiff incorporates paragraphs 1 through 104 herein by reference.

105.    This cause of action arises under the Patent laws of the United States, including 35 U.S.C. §§ 271, *et seq*.

106.    Plaintiff is the owner of the '962 Patent with all substantial rights to the '962 Patent including the exclusive right to enforce, sue, and recover damages for past and future infringement.

107.    The '962 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

### DIRECT INFRINGEMENT (35 U.S.C. § 271(a))

108.    Defendant has, and continues to, infringe one or more claims of the '962 Patent in this District and elsewhere in Texas and the United States.

109.    On information and belief, Defendant has, and continues to, via an agent or agents, infringe claims of the '962 Patent (including for example, and as illustrated below, Claim 9) by, among other things, making, using, testing (including its own use and testing), selling, offering for sale, importing and/or licensing in the United States without authority systems, products, and

methods claimed by the '962 Patent, namely, the BLU Vivo X smartphone.

110.    Defendant had knowledge of the '962 Patent and its direct infringement since at least February 19, 2020, when Defendant was notified of the Asserted Patents and its infringement of the '962 Patent when Defendant received an email and link to claim charts detailing Defendant's infringement of the '962 Patent. On information and belief, Defendant was made aware of Plaintiff's Kodak patent portfolio including the '962 Patent since at least February 19, 2020, and thus has had knowledge of its direct infringement of the '962 Patent since that time.

111.    Upon information and belief, and as one illustration without limitation, Defendant infringes Claim 9 of the '962 Patent in the exemplary manners described below.

112.    The BLU Vivo X with its "dual rear main cameras" performs a method for using its digital camera, having two imaging stages, for producing an output image and a range map of a scene from a captured image signal. For example, the BLU Vivo X includes a digital camera with two imaging stages for outputting an image (i.e., "producing an output image") and a distance map (i.e., "range map") of a scene from a captured image signal. *See* https://bluproducts.com/devices/vivo-x/sales-guide/vivo-x-sg.pdf



113.    The BLU Vivo X forms a 13 MP image (i.e., first image) of the scene from a sensor output of the 13 MP image sensor in a 13 MP imaging stage (i.e., "first imaging stage") and a 5 MP image (i.e., second image) of the scene from a sensor output of the 5 MP image sensor in a 5 MP imaging stage (i.e., "second imaging stage").



*Id.*

114.    The 13 MP and 5 MP cameras have different angles of view.



https://www.gsmarena.com/blu_vivo_x-9072.php



https://d86o2zu8ugzlg.cloudfront.net/mediatek-craft/documents/Dual-Camera-White-Paper.pdf

115.    Thus, the Vivo X performs "forming a first image of the scene from a sensor output of a first image sensor located in a first imaging stage" and "forming a second image of the scene from a sensor output of a second image sensor located in a second imaging stage, wherein the first and second images have different angles of view."

116.    The Vivo X performs "selecting the sensor output from one of the imaging stages as the captured image signal" where it selects the sensor output from the 13 MP imaging stages as the primary captured image signal.

| MAIN CAMERA | Dual | 13 MP, 1/3.1", 1.12μm, PDAF |
| | | 5 MP, f/2.4, 1/5.0", 1.12μm, depth sensor |
| | Features | LED flash, HDR |
| | Video | 1080p@30fps |

https://www.gsmarena.com/blu_vivo_x-9072.php

The dual main camera setup boasts a 13 megapixel camera sensor featuring advanced technologies, F/2.0 aperture, 1/3 inch sensor with 5P lens, real-time HDR, and Phase Detection Autofocus (PDAF) with Laser Focus for twice the focus rate and accuracy. Paired with a 5 megapixel camera that is used to capture depth of field to take the perfect picture.

https://www.bluproducts.com/news/2018-vivo-x.html

117.    The BLU Vivo X performs "using the images from both imaging stages to generate a range map identifying the distances to different portions of the scene" where it compares the image content from the 13 MP image and the 5 MP image (i.e., "uses the images from both imaging sensors") to generate a depth map (i.e., "range map") *See* https://d86o2zu8ugzlg.cloudfront.net/mediatek-craft/documents/Dual-Camera-White-Paper.pdf

**Dual camera technology** encompasses a wide range of imaging system and vision analysis research and development. Imaging systems, like two eyes, synchronize the dual sensors to capture stereo images. Stereo-vision analysis plays a similar role as that of the human brain, which retrieves perceptual information via complex computational processing. By comparing image content from two vantage points, depth information can be extracted by the examination of the relative positions of objects in the two panels, known as stereopsis.

118.    The BLU Vivo X uses a "depth Engine" to identify the depth (i.e., distances from the camera) of objects in the foreground and the background (i.e., "different portions") of the scene.



*Id.*



https://www.youtube.com/watch?v=p5bFzlfifkI

119.    "The range map is used to enable dynamic depth of field images by blurring portions of the output image that correspond to areas of the scene that lie outside of a desired depth of field" The distance map is used to enable dynamic depth of field images by blurring, for example, the background (i.e., "portions") of the output image that correspond to areas of the scene outside of a depth of an object in the foreground (i.e., "desired depth of field"). See https://www.bluproducts.com/news/2018-vivo-x.html ("a 13 Megapixel camera . . . [is] paired with a 5 megapixel camera that is used to capture depth of field to take the perfect picture."). This is used to create blur in the picture.

> **Benefits of Dual Lens Cameras**
>
> The ability to create the bokeh effect, which is the out-of-focus blur in a photograph, has long been associated with high end photography setups. Highlighting the subject your photos by purposefully blurring the background lends a dramatic, impactful effect to photos, no matter the skill level of the photographer behind the lens.

http://poweredbymediatek.com/2017/08/dual-lens-camera-work-can-work/

120.    Defendant is liable for its infringements of the '962 Patent pursuant to 35 U.S.C. § 271.

**INDIRECT INFRINGEMENT (INDUCEMENT - 35 U.S.C. §271(b))**

121.    Based on the information presently available to Plaintiff, absent discovery, in the alternative and in addition to direct infringement, Defendant has and continues to, indirectly infringe one or more claims of the '962 Patent by inducing direct infringement of the Accused Products by others, including, but not limited to subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users.

122.    Defendant had knowledge of the '962 Patent and its indirect infringement since at least February 19, 2020, when Defendant was notified of the Asserted Patents and its infringement of the '962 Patent when Defendant received an email and link to claim charts detailing Defendant's infringement of the '962 Patent. On information and belief, Defendant was made aware of Plaintiff's Kodak patent portfolio including the '962 Patent since at least February 19, 2020, and thus has had knowledge of its indirect infringement of the '962 Patent since that time.

123.    On information and belief, despite having knowledge of the '962 Patent and its infringement, Defendants specifically intended and encouraged one or more of its subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users to make, offer for sale, or sell in the United States and/or import the BLU Products Mobile Application into

the United States, which (as illustrated above) infringes claims of the '962 Patent. Defendant's acts have resulted in, and continue to result in, direct infringement by such subsidiaries, dealer agents, Mobile Virtual Network Operators ("MVNOs), retailers, and/or end users for making, using, offering for sale, selling, and/or importing the BLU Products Mobile Application.

124.    Defendant has also specifically intended and encouraged individuals in this District and elsewhere in the United States to directly infringe claims of the '962 Patent (e.g., Claim 10 as described above) by acquiring and using the BLU Products Mobile Application. Despite having knowledge of the '962 Patent and its infringement, Defendant has instructed and encouraged end users of the BLU Vivo X in a manner that infringes the '962 Patent.

125.    Plaintiff has been damaged as a result of Defendant's unlicensed infringing conduct described in this Count. Defendant is thus liable to Plaintiff in an amount that adequately compensates Plaintiff for Defendant's infringement, which, by law, cannot be less than a reasonable royalty together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

126.    Plaintiff has satisfied the requirements of 35 U.S.C. § 287 and is entitled to recover damages for infringement occurring before the filing of this lawsuit.

## COUNT X
### (Willful Infringement)

127.    Plaintiff incorporates paragraphs 1 through 127 herein by reference.

128.    Prior to the filing of this action, Defendant was aware of its infringement of the Asserted Patents.

129.    As detailed above, Defendant was sent detailed claim charts detailing Defendant's infringement of the '039 Patent and the '962 Patent and Defendant has been, or should have been, aware of its infringement of the other Asserted Patents since at least entering MPV's data room on February 19, 2020.  Defendant was aware of Plaintiff's Kodak patent portfolio including the '573

Patent and the '668 Patent and thus Defendant has been or should have been aware of its infringement of those patents since at least its receipt on October 7, 2021.

130.    On information and belief, despite being aware of the Asserted Patents and its infringement of the Asserted Patents, Defendant has not secured a license, changed or otherwise altered the Accused Products or its practices to avoid infringing the Asserted Patents. Rather, despite having notice of the Asserted Patents, Defendant has, and continues to, infringe the Asserted Patents, directly and/or indirectly, in disregard of Plaintiff's patent rights.

131.    Defendant has acted recklessly and egregiously, and continues to willfully, wantonly, and deliberately, engage in acts of infringement of the Asserted Patents, justifying a finding of willful infringement and an award to Plaintiff of increased damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

## JURY DEMAND

132.    Plaintiff requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

Plaintiff asks that the Court find in its favor and against Defendant and that the Court grant Plaintiff the following relief:

a.    judgment that Defendant has directly infringed one or more claims of the Asserted Patents, either literally and/or under the doctrine of equivalents;

b.    judgment that Defendant has indirectly infringed one or more claims of the Asserted Patents, either literally and/or under the doctrine of equivalents;

c.    judgment that Defendant has willfully infringed one or more claims of the Asserted Patents;

d.    judgment that Defendant accounts for and pays to Plaintiff all damages and costs incurred by Plaintiff as a result of Defendant's infringing activities, and in no event less than a reasonable royalty;

e.    judgment that Defendant pays to Plaintiff a reasonable, ongoing, post judgment royalty to the unexpired patents so long as Defendant continues its infringing activities;

f.    An award of treble damages under 35 U.S.C. § 284 for Defendant's willful infringement;

g.    pre-judgment and post judgment interest;

h.    judgment that this case be found as exceptional under 35 U.S.C. § 285 and an award reasonable attorney fees;

i.    a permanent injunction against Defendant, its officers, agents, employees, and those acting in privity with it, from further infringement or inducing infringement of the Asserted Patents; and

j.    that Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

Dated: April 12, 2023                Respectfully submitted,

**PLATT CHEEMA RICHMOND PLLC**

*/s/ Matthew C. Acosta*

Matthew C. Acosta
Texas Bar No. 24062577
macosta@pcrfirm.com
Nicholas C. Kliewer
Texas Bar No. 24083315
nkliewer@pcrfirm.com
1201 N. Riverfront Blvd., Suite 150
Dallas, Texas 75207
214.559.2700 Main
214.559.4390 Fax

**ATTORNEYS FOR PLAINTIFF
MONUMENT PEAK VENTURES, LLC**